# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CHRYSTIA SIOLKOWSKY, derivatively on behalf of QUANTUM COMPUTING INC., | |
| Plaintiff, | Case No. 2:25-cv-02156 |
| vs. | |
| WILLIAM MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, CHRISTOPHER ROBERTS, ROBERT FAGENSON, YUPING HUANG, MICHAEL TURMELLE, and BERTRAND VELGE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| QUANTUM COMPUTING INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Chrystia Siolkowsky ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Quantum Computing Inc. ("Quantum" or the "Company"), files this Verified Shareholder Derivative Complaint against William McGann ("McGann"), Robert Liscouski ("Liscouski"), Christopher Boehmler ("Boehmler"), Christopher Roberts ("Roberts"), Robert Fagenson ("Fagenson"), Yuping Huang ("Huang"), Michael Turmelle ("Turmelle"), and Bertrand Velge ("Velge") (collectively, the "Individual Defendants," and together with Quantum, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Quantum, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants McGann, Liscouski, Boehmler, and Roberts for

1

contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Quantum, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants between March 30, 2020 and January 15, 2025, both dates inclusive (the "Relevant Period").

2.     Quantum is a Delaware corporation located in Hoboken, New Jersey that purports to be "utilizing integrated photonics and non-linear quantum optics to develop and deliver machines for quantum computing, reservoir computing, and remote sensing, imaging and cybersecurity applications."[1] The Company represents that its "proprietary core technology" rests in its "ability to condition, manipulate, and measure single photons (particles of light)."[2]

3.     In its SEC filings, the Company notes that its "longer-term product development plan" is "to migrate product designs based on discrete components [] to a set of optical integrated

---

[1]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001758009/000121390025025561/ea0234742-10k_quantum.htm#a_002

[2] *Id.*

circuits built on wafers using a crystalline material"[3] called lithium niobate ("Thin Film Lithium Niobate" or "TFLN"). TFLN purportedly enables a significant boost in transmission rates and reduces power consumption, thus reducing the environmental impact and cost of digital consumption.[4]

4.      In September 2023, the Company announced that it had chosen a five-acre location in Arizona State University's ("ASU") Research Park in Tempe, Arizona (the "ASU Research Park") for its "Quantum Photonic Chip Foundry" where it would purportedly produce TFLN chips. Defendants repeatedly represented to investors at all relevant times that the Company expected to mass produce the TFLN chips by late 2024 to early 2025.

5.      During the Relevant Period, the Individual Defendants also repeatedly touted the Company's purportedly successful business dealings, include those with Quad M Solutions, Inc. ("Quad M"), a staffing solutions company, and millionways, Inc. ("millionways"), purportedly a leading AI firm. However, Defendants continuously represented that these partnerships were the result of Quantum's ability to significantly assist a given use-case through its advanced differentiated quantum computing technologies while failing to disclose that insiders at the Company were heavily involved in the businesses of Quad M and millionways. In addition, they continuously touted the Company's alleged "long standing strategic partnership" with the National Aeronautics and Space Administration ("NASA").

6.      Indeed, during the Relevant Period, the Individual Defendants caused the Company to engage in related party transactions with Quad M and millionways that benefitted the Individual Defendants, as individuals involved with Quad M and millionways, to the Company's detriment.

---

[3] *Id.*
[4] https://www.electrooptics.com/article/photonics-start-raises-7m-commercialise-pic-foundry-service

Indeed, Defendant Liscouski, the Company's then-CEO, was serving as a director as Quad M at the time the Company announced that Quad M was its first consulting customer; however, the Individual Defendants failed to disclose this relationship to investors. Notably, Capybara reported that Quad M was "*an OTC listed company with ties to multiple stock frauds.*" In addition, one of the Company's founders was involved in millionways, but that, too, was not disclosed to investors (collectively, the "Related Party Transactions Misconduct").

7.       The truth began to emerge on November 27, 2024 when, during intraday trading hours, Iceberg Research published a report titled "Quantum Computing Inc: the Phantom Chip Foundry" (the "November 2024 Iceberg Report") alleging, *inter alia*, that Quantum's press releases and representations about its TFLN foundry and the purchase orders for Quantum's TFLN chips were false. The report discussed the Company's purported ASU Research Park foundry, stating: "The facility is intended to fulfil the company's announced purchase orders for TFLN chips, *with production expected to begin in 1Q25, indicating that the facility is nearly ready*."[5] However, it revealed that when Iceberg investigators went to inspect the site of the alleged foundry, they founds, *inter alia*, that "[p]eople walking around outside said this was an office building"; that "[t]here are no loading docks (that have an elevated space to facilitate loading) or very large doors" and thus "[t]here would be no way to get very large machines inside, which you would expect for a chip foundry about to start 'mass production'"; and that "[f]rom the outside, the buildings do not look suitable for a foundry, which needs high ceilings and open spaces for heavy equipment, and proper ventilation for handling fumes in an environment highly sensitive to contamination."

---

[5] All emphasis has been added unless otherwise noted herein.

8.    The November 2024 Iceberg Report further revealed that "[i]n September 2023, QUBT told investors that the location for its *'new [manufacturing] facility is on five acres within the extensive 320-acre research park hosted by ASU'*. However, *the entire 2050 building is barely more than an acre, let alone Suite 107 in the building*."

9.    The truth continued to emerge shortly after the market opened on December 9, 2024 when Iceberg Research published a second report about the Company, which stated the following, in relevant part:

> [QUANTUM] has shared photos online of what it claims to be its foundry. But this setup looks more like a laboratory. ***This is a far cry from a foundry ready for "mass production"*** on what [QUANTUM] said would be "five acres within the extensive 320-acre research park hosted by ASU". Throwing together some equipment does not make an operational TFLN-chip foundry. [QUANTUM] has already experienced delays compared to its initial production schedule. Many other companies would already be manufacturing TFLN devices, if creating such a facility were this straightforward.
>
> * * *
>
> From 2021 to 9M24, the company reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor. The company has kept recording losses.

10.    The report concluded by stating that: "*[i]nvestors should be warned that [Quantum] has a long history of misrepresentations, which come in the form of optimistic announcements, interspersed with technical mumbo jumbo – sucking in new investors, unaware of the history, the background of some managers/directors, and eventually getting burned*."

11.    On this news, the Company's stock price fell $0.46 per share, or 5.8%, from a closing price of $7.93 on December 6, 2024 to close at $7.47 per share on December 9, 2024.

12.    The truth fully emerged during intraday trading hours on January 16, 2025 when Capybara Research ("Capybara") published a report (the "Capybara Report") announcing that Quantum "has faked sales, faked partnerships, and has put out a steady stream of deceptive [press releases] filled with misrepresentations and outright lies." Among other things, Capybara reported

that the Company "*is a rampant fraud*"; that, "*[f]rom inception, the company has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases*"; and that "*[t]o conceal their fraud, [Quantum] even included a clause in employee separation agreements prohibiting them from talking to the SEC[.]*" Additionally, the Capybara Report quoted a former Company employee, who stated that Quantum "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't." Moreover, Capybara reported that Quantum had never purchased the five-acre parcel at the ASU Research Park for its TFLN foundry, citing ASU Research Park management.

13.     On this news, the price per share of the Company's stock fell $1.72 over the following two trading sessions, or 14.89%, from a closing price of $11.55 per share on January 15, 2025 to close at $9.83 per share on January 17, 2025.

14.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and its related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants'

statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.    The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts.

16.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO and CEO to a securities class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of Quantum. Plaintiff has continuously held Quantum common stock at all relevant times.

24.    Plaintiff is a citizen of Canada.

### Nominal Defendant Quantum

25.     Quantum is a Delaware corporation with principal executive offices at 5 Marine View Plaza, Suite 214 Hoboken, NJ. Quantum's common stock trades on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "QUBT."

**Defendant McGann**

26.     Defendant McGann has served as the Company's CEO and President since February 1, 2024. Prior to that, he had served as the Company's Chief Technology Officer and Chief Operations Officer since January 2022 and as a Company director from September 2021 to December 2021.

27.     Upon information and belief, Defendant McGann is a citizen of Massachusetts.

28.     The 2024 Proxy Statement stated the following about Defendant McGann:

**William McGann** has served as the Company's Chief Executive Officer and President since February 1, 2024. Prior to that, he had served as the Company's Chief Technology Officer and Chief Operations Officer since January 2022 and as a Director of the Company from September 2021 to December 2021. Prior to joining Quantum Computing, Dr. McGann was the Chief Technology Officer for the Security, Detection and Automation business at Leidos Holdings, Inc., a provider of technical services, primarily to the U.S. government, from May 2019 to January 2022. Dr. McGann has a strong, directed passion for transforming credible science into practical technology solutions in solving some of the world's greatest challenges. Prior to joining Leidos, Dr. McGann held numerous business and technology leadership positions and roles including (a) Founder of the first explosives trace detection company, Ion Track Instruments, (b) Chief Technology Officer for GE Security, (c) VP of Engineering for United Technologies Fire and Security business, (d) CEO and board member of Implant Sciences Corp., and (e) Chief Technology Officer at L3Harris Aviation Security and Detection business. Dr. McGann holds a Ph.D. in Chemical Physics from the University of Connecticut and undergraduate degrees in Chemistry and Biology.

**Defendant Liscouski**

29.     Defendant Liscouski served as the Chairman of the Board from February 2018 to December 2024 and as the Company's CEO and President from March 2018 until January 2024.

30.     Upon information and belief, Defendant Liscouski is a citizen of Washington, D.C.

31.     The 2024 Proxy Statement stated the following about Defendant Liscouski:

**Robert Liscouski** is the Chairman of the Board; he has served in this position since February 2018. From March 2018 through January 2024 Mr. Liscouski served as the Company's Chief Executive Officer and President. Prior to that Mr. Liscouski served as Chairman and Founder of Convergent Risk Group LLC, an enterprise security risk management firm specializing in the convergence of physical and cyber risk, from January 2011 through May 2019 and as President of Implant Sciences Corp., a public company that became a leader in the explosive trace detection industry culminating in the sale of the technology to L3 Communications in January 2017. Mr. Liscouski is a proven security professional, thought leader and successful entrepreneur with over 35 years of senior level security operational and company leadership experience in government and public and private companies. Mr. Liscouski is a recognized security industry leader in assessing, mitigating and managing physical and cybersecurity risk in private sector enterprises and state and federal government agencies. Mr. Liscouski has extensive experience in leading innovative start up and turnaround companies as well as building programs for large government organizations and is recognized as a leader in identifying emerging security technologies. He serves as a "Trusted Advisor" to senior officials within government and private sector, providing guidance in areas such as physical and cyber security, crisis management, organizational development and strategic planning. Mr. Liscouski's career has spanned local law enforcement, senior government and private sector positions from operations to senior leadership and Boards of Directors. He served as a senior advisor to the intelligence community and was appointed by President George W. Bush as the first Assistant Secretary for Infrastructure Protection at the Department of Homeland Security. Mr. Liscouski is a founder and Chairman of the Board of the National Child Protection Task Force, a 501(c)(3) charitable organization, and served on the Board of Clean Coal Technologies Inc. (CCTC) from 2019 until December 2020. He received his Bachelor of Science degree in Criminal Justice from John Jay College and his MPA in Public Administration from the Kennedy School of Government, Harvard University.

## Defendant Boehmler

32.    Defendant Boehmler has served as the Company's CFO since June 2023

33.    Upon information and belief, Defendant Boehmler is a citizen of Washington, D.C.

34.    The 2024 Proxy Statement stated the following about Defendant Boehmler:

**Chris Boehmler** has served as the Company's Chief Financial Officer since July 1, 2023. Mr. Boehmler joined Quantum Computing Inc. as Controller in March 2022. He worked as an independent consultant from June 2018 until March 2022, serving both private and non-profit organizations. Previous to June 2018, his corporate finance experience totals 12 years in senior management positions for private and public technology-driven and financial institutions, primarily at Bridgewater Associates, LP and Intelsat. During this time, he also led the finance functions for two start-ups where he was instrumental in raising private equity and performing

due diligence on acquisition targets. His financial expertise spans capital markets, planning & analysis, accounting operations, management and regulatory reporting, financial systems integrations, and Sarbanes Oxley Act financial risks & controls. He started his career working in the investment banking division of Credit Suisse First Boston, followed by strategic management consulting for Booz Allen Hamilton. Mr. Boehmler has an undergraduate degree in Economics with a minor in Germanic Studies from the University of Chicago.

**Defendant Roberts**

35.    Defendant Roberts served as the Company's CFO from February 2018 until June 2023.

36.    Upon information and belief, Defendant Roberts is a citizen of Washington, D.C.

**Defendant Huang**

37.    Defendant Huang has served as the Company's Chief Quantum Officer and as a Company director since June 14, 2022.

38.    Upon information and belief, Defendant Huang is a citizen of New Jersey.

39.    The 2024 Proxy Statement stated the following about Defendant Huang:

**Yuping Huang** has served as the Company's Chief Quantum Officer and a Director since June 14, 2022. Dr. Huang has over 20 years of experience in commercial and academic settings, with pioneering research in a wide spectrum of quantum physics, optics, and technology. Prior to joining the Company, Dr. Yuping founded QPhoton, Inc., where he served as Chief Executive Officer from 2020 until its acquisition by the Company in 2022. QPhoton was a development stage company commercializing quantum photonic technology and devices to provide innovative and practical quantum solutions for critical challenges facing big data, cyber, remote sensing, and healthcare industries. Dr. Huang worked as a postdoctoral fellow, a research faculty member, and principal investigator at Northwestern University from 2009-2014. Dr. Huang has been a Professor of Physics at the Stevens Institute of Technology, a private research technological university in Hoboken, New Jersey, since 2014 (from 2014 to 2019 as assistant professor, from 2019-2023 as associate professor and as a full professor since 2023). Dr. Huang is the founding director of the Center for Quantum Science and Engineering and Gallagher Associate Professor of Physics at the Stevens Institute of Technology. He received a Bachelor of Science in modern physics from the University of Science and Technology of China in 2004 and a PhD in quantum AMO physics in 2009 from Michigan State University. Dr. Huang's expertise in quantum physics and optics and leadership experience in quantum research qualifies him to serve as a member of the Board.

**Defendant Fagenson**

40.     Defendant Fagenson has served as a Company director since March 2021. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee, Nominating & Corporate Governance Committee, and Risk Committee.

41.     Upon information and belief, Defendant Fagenson is a citizen of New Jersey.

42.     The 2024 Proxy Statement stated the following about Defendant Fagenson:

**Robert Fagenson** has served as a Director of the Company since March 2021. Mr. Fagenson has served as a member of the board of directors of National Holdings Corporation ("NHC"), a broker-dealer, since March 2012. He has served as vice chairman of the board of directors of NHC since September 2016. Mr. Fagenson previously served as co-chief executive officer of NHC from January 3, 2017 to January 31, 2017, as chief executive officer and chairman of the board of directors of NHC from December 2014 to September 2016, and as executive vice-chairman of the board of directors of NHC from July 2012 to December 2014. NHC was acquired by B. Riley Financial in February 2024. Mr. Fagenson has been a branch owner at National Securities Corp, an operating company of NHC, since 2012, and president of Fagenson & Co., Inc., a family investment company, since 1982. Mr. Fagenson spent the majority of his career at the New York Stock Exchange ("NYSE"), where he was managing partner of one of the exchange's largest specialist firms. While at the NYSE, Mr. Fagenson served as a governor on the trading floor and was elected to the NYSE board of directors in 1993, where he served for six years, eventually becoming vice chairman of the NYSE board of directors from 1998 to 1999 and 2003 to 2004. Mr. Fagenson has served as director of the New York City Police Museum since 2005 and as director of the Federal Law Enforcement Officers Association Foundation since 2009. He has also served on the board of directors of Sigma Alpha Mu Foundation since 2011 and on the board of directors of New York Edge since 2015. In addition, Mr. Fagenson served as the non-executive chairman of Document Security Systems, Inc. from 2012 to 2018 (NYSEMKT: DSS). He is currently a member of the alumni boards of the Whitman School of Business at Syracuse University. Mr. Fagenson received his B.S. in Transportation Sciences & Finance from Syracuse University in 1970. Mr. Fagenson's experience in the financial services industry and in senior leadership positions qualifies him to serve as a member of the board and as chairman of the audit committee.

**Defendant Turmelle**

43. Defendant Turmelle has served as a Company director since January 2022. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee.

44. Upon information and belief, Defendant Turmelle is a citizen of New Hampshire.

45. The 2024 Proxy Statement stated the following about Defendant Turmelle:

**Michael Turmelle** has served as a Director of the Company since January 2022. Mr. Turmelle has served on the board of directors of Ideal Power Inc. since December 2017 and as chairman of the Ideal Power board since 2021. From January 2018 through January 2024, Mr. Turmelle served as the Managing Director of Hayward Tyler, a United Kingdom private equity-backed manufacturer and service provider of pumps and motors, which he joined in February 2015. Mr. Turmelle also served on the boards of Hayward Tyler and Energy Steel (a Hayward Tyler subsidiary) from 2017 until January 2024. Hayward Tyler designs, manufactures, and services performance-critical electric motors and pumps to meet the most demanding of applications for the global energy industry, as both an original equipment manufacturer supplier and trusted partner. Previously, Mr. Turmelle ran his own consulting company, working with start-ups and turn-arounds in the areas of renewable energy, medical, and other advanced technologies. Mr. Turmelle has served on numerous Boards of Directors including the Board of Directors of Implant Sciences Corp., an explosive and narcotic trace detection company, where he served as Chairman of the Board from 2015 to 2017. Mr. Turmelle was Chief Financial Officer and Chief Operating Officer and a member of the Board of Directors of SatCon Technology Corporation, a maker of energy management systems, from 1992 to 2005. Mr. Turmelle was also on the Board of Directors of Beacon Power, a SatCon spin-off company dealing in flywheel energy storage, from 1996 to 2000. Mr. Turmelle has a BA in Economics from Amherst College and is a graduate of General Electric's Financial Management Program. Mr. Turmelle's experience as a public company director and executive as well as extensive experience in finance, business operations and technology, qualifies him to serve as a member of the Board and as chairman of the compensation committee.

**Defendant Velge**

46. Defendant Velge served as a Company director from 2018 until he resigned on November 20, 2023.

47. Upon information and belief, Defendant Velge is a citizen of England.

48. The 2023 Proxy Statement (defined below) stated the following about Defendant Velge:

Bertrand Velge has served as a Director of the Company since 2018. He is the Managing Director of Graftyset, Ltd., a wholesale distributor of wine, beer and other alcoholic and non-alcoholic beverages based in the United Kingdom. Mr. Velge has served as Managing Director since the company was incorporated in 2003 under the name of Otterden Vintners, Ltd. Mr. Velge has also served as Director for Aliunde Ltd., a commodities trading firm based in the U.K., since 2005, and as a director of LifeMD (Nasdaq: LFMD) since 2019. Mr. Velge has over 25 years of experience in multi-disciplinary venture investing and was managing director and co-founder of a fund that trades equities in Europe, Asia, and the United States focusing on initial public offerings. He speaks English, Flemish, and French, and is a graduate of the Universite Catholique de Louvain.

We believe that Mr. Velge's extensive experience in international business management and investment, his experience with the public and private capital markets in the U.S. and Europe, and his management expertise with several small, growing companies to help guide corporate governance, qualify him to serve on the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors, and/or fiduciaries of Quantum and because of their ability to control the business and corporate affairs of Quantum, the Individual Defendants owed Quantum and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Quantum in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Quantum and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Quantum and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Quantum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.    To discharge their duties, the officers and directors of Quantum were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Quantum, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Quantum's Board at all relevant times.

54.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would

be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

55.     To discharge their duties, the officers and directors of Quantum were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Quantum were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Quantum's own Code of Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Quantum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Quantum and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Quantum's operations would comply with all

applicable laws and Quantum's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.    Each of the Individual Defendants further owed to Quantum and the shareholders the duty of loyalty requiring that each favor Quantum's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Quantum and were at all times acting within the course and scope of such agency.

58.    Because of their advisory, executive, managerial, directorial, and controlling positions with Quantum, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Quantum.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Quantum was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Quantum and was at all times acting within the course and scope of such agency.

## <u>QUANTUM'S CODE OF CONDUCT</u>

65.     Quantum's Code of Conduct states that the Company's policy is as follows:

It is the policy of Quantum Computing Inc. ("Quantum" or the "Company") that the Company's Board of Directors ("Board"), Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), principal accounting officer or controller (or persons performing similar functions) and all employees adhere to, advocate and promote the following principles: • Loyalty to the interests of our shareholders, customers, suppliers, fellow employees, strategic partners and other business associates; • Honest and ethical conduct in any action, practice or course of conduct within the Company or with its business partners; • Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; • Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission (the "SEC") and other public communications made by the Company; and • Compliance with laws, rules and regulations applicable to the Company.

66.     In the section "Corporate Opportunities and Transactions with Business Associates," the Code of Conduct states the following, in relevant part:

Insiders and their family members must not profit, directly or indirectly, due to their position in the Company to the detriment, or at the expense, of the Company or any of its business associates. No insider shall take for his or her own advantage any business opportunity for profit that he or she learns about as a result of his or her position with the Company.

67.     In the section "Document Retention," the Code of Conduct states the following, in relevant part:

• The Company will comply fully with all applicable laws and regulations concerning the retention and preservation of records. All insiders shall comply fully

with the Company's policies regarding the retention and preservation of records. Under no circumstances may Company records be destroyed selectively or maintained outside Company premises or designated storage facilities.

• If the existence of a subpoena or impending government investigation becomes known to an insider, he or she must immediately contact the CEO and Chair of the Company's Audit Committee of the Board, if such Audit Committee is in place. If there is not an Audit Committee in place, he or she must immediately contact the CFO. Insiders must retain all records and documents that may be responsive to a subpoena or pertain to an investigation.

68.    In the section "Reporting and Treatment of Violations," the Code of Conduct states

the following:

Persons who become aware of or suspect violations of this Code should report such suspected violations promptly to the Chair of the Company's Audit Committee of the Board, if such Audit Committee is in place. If there is not an Audit Committee in place, he or she must immediately contact the Chairman of the Board if such person is different than the CEO, or if such person is not, then the person should immediately contact another member of the Board. To assist in the response to or investigation of the alleged violation, the report should contain as much specific information as possible to allow for proper assessment of the nature, extent and urgency of the alleged violation. Without limiting the foregoing, the report should, to the extent possible, contain the following information:  • The alleged event, matter or issue that is subject of the alleged violation; • The name of each person involved;  • If the alleged violation involves a specific event or events, the approximate date and location of each event; and  • Any additional information, documentation or other evidence available relating to the alleged violation. The Audit Committee of the Board, if one is in place, and if not, the entire Board, shall have the power to monitor, investigate, make determinations and take action with respect to violations of this Code of Ethics. In determining whether a violation of this Code of Ethics has occurred, the Audit Committee of the Board, if one is in place, and if not, the entire Board, may take into account: • The nature and severity of the violation;  • Whether the violation was a single occurrence or involved repeated occurrences; • Whether the violation appears to have been intentional or inadvertent; • Whether the person in question had been advised prior to the violation as to the proper course of action; • Whether the person in question had committed other violations in the past; and  • Such other facts and circumstances as the Audit Committee of the Board shall deem advisable in the context of the alleged violation.

69.    In the section "Conflicts of Interest," the Code of Conduct states the following, in

relevant part:

• Insiders (directors, officers and employees of the Company) shall maintain a high degree of integrity in the conduct of the Company's business and maintain independent judgment. Each insider must avoid any activity or personal interest that creates, or reasonably appears to create, a conflict between his/her interests and the interests of the Company. A conflict of interest arises any time such a person has a duty or interest that may conflict with the proper and impartial fulfillment of such person's duties, responsibilities or obligations to the Company, such as: o Making an investment that may affect his/her business decisions; o Owning a meaningful financial interest in, or being employed by, an organization that competes with or whose interests could reasonably be expected to conflict with those of the Company; o Owning a meaningful interest in, or being employed by, an organization that does, or seeks to do, business with the Company; o Making a decision on a matter where such person's self-interests may reasonably call into question the appropriateness of the decision; and o Being employed by or accepting compensation from any other person as a result of business activity or prospective business activity affecting the Company.

70.     In the section "Requests for Waivers and Changes in Code of Ethics," the Code of Conduct states the following:

A waiver of a provision of this Code of Ethics shall be requested whenever there is reasonable likelihood that a contemplated action will violate the Code of Ethics. Any waiver of this Code of Ethics for executive officers or directors may be authorized only by the Board or, to the extent permitted by the rules of any securities exchange on which any securities of the Company are listed, a committee of the Board. Any waiver (including an implicit waiver) of a provision of this Code of Ethics shall be publicly disclosed on a timely basis, to the extent required by applicable rules and regulations of the SEC and any securities exchange on which securities of the Company are listed. In addition, any amendments to this Code of Ethics (other than technical, administrative or other non-substantive amendments) shall be publicly disclosed on a timely basis, to the extent required by applicable rules and regulations of the SEC.

71.     In violation of the Code of Conduct, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of

Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business

in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

72.     The Company also maintains an Audit Committee Charter. Under a section titled

"Audit Committee Purpose," the Audit Committee Charter states the following:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors
> (the "Board") of Quantum Computing Inc. ("QUBT" or the "Company") is to
> oversee the processes of accounting and financial reporting of the Company and
> the audits and financial statements of the Company. The Committee's primary
> duties and responsibilities are to: Monitor the integrity of the Company's financial
> reporting process and systems of internal controls regarding finance, accounting
> and legal compliance. Monitor the independence and performance of the
> Company's independent auditors and the Company's accounting personnel.
> Provide an avenue of communication among the independent auditors,
> management, the Company's accounting personnel, and the Board. Appoint and
> provide oversight for the independent auditors engaged to perform the audit of the
> financial statements. Discuss the scope of the independent auditors' examination.
> Review the financial statements and the independent auditors' report. Review areas
> of potential significant financial risk to the Company. Monitor compliance with
> legal and regulatory requirements. Solicit recommendations from the independent
> auditors regarding internal controls and other matters.  Make recommendations to
> the Board. Resolve any disagreements between management and the auditors
> regarding financial reporting. Prepare the report required by Item 407(d) of
> Regulation S-K, as required by the rules of the Securities and Exchange
> Commission (the "SEC").  Perform other related tasks as requested by the Board.

73.     Under a section titled "Review Procedures," the Audit Committee Charter states

the following, in relevant part, regarding the Audit Committee's responsibilities:

> A. Review the Company's annual audited financial statements prior to distribution.
> Review should include discussion with management and independent auditors of
> significant issues regarding accounting principles, practices, and judgments.
>
> B. In consultation with the management, the independent auditors, and the
> Company's principal accounting officer, consider the integrity of the Company's
> financial reporting processes and controls, including any major issues as to the
> adequacy of the Company's internal controls, and any special steps adopted in light
> of any identified material control deficiencies. Discuss significant financial risk
> exposures and the steps management has taken to monitor, control, and report such
> exposures. Review significant findings prepared by the independent auditors and
> the Company's principal accounting officer together with management's responses.

C. The Committee shall review with the management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies.

74.    In the section "Accounting Department and Legal Compliance," the Audit Committee Charter states the following regarding the responsibilities of the Audit Committee:

The Committee shall: Review the personnel activities and qualifications of the Company's accounting personnel, as needed. Review the appointment and performance of the principal accounting officer, and review financial and accounting personnel succession planning with the Company. Review significant reports prepared by the Company's principal accounting officer together with management's response and follow-up to these reports. On at least an annual basis, review with the Company's counsel any legal matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations, and inquiries received from regulators or governmental agencies. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. The Committee shall review the CEO and CFO's disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act. Conduct an appropriate review of and approve all related party transactions on an ongoing basis and the Committee shall review potential conflict of interest situations where appropriate. Conduct an annual risk review with respect to the matters within the role and the responsibilities of the Committee. . . . Report regularly to the Board on its activities; General Maintain minutes of its meetings and records relating to those meetings and the Committee's activities; Have authority to obtain, at the expense of the Company, advice and assistance from internal or external legal, consulting or other advisors; Form and delegate authority to subcommittees of one or more Committee members when desired and appropriate; Review and reassess the adequacy of this Charter annually and recommend to the Board any proposed changes to this Charter; and Periodically review the Committee's own performance.

75.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a),

23

of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT

#### *Relevant Background*

76.     Quantum is a Delaware corporation located in Hoboken, New Jersey that purports to be "utilizing integrated photonics and non-linear quantum optics to develop and deliver machines for quantum computing, reservoir computing, and remote sensing, imaging and cybersecurity applications."[6] The Company represents that its "proprietary core technology" rests in its "ability to condition, manipulate, and measure single photons (particles of light)."[7]

77.     In its SEC filings, the Company notes that its "longer-term product development plan" is "to migrate product designs based on discrete components [] to a set of optical integrated circuits built on wafers using a crystalline material"[8] called lithium niobate ("Thin Film Lithium Niobate" or "TFLN"). TFLN purportedly enables a significant boost in transmission rates and reduces power consumption, thus reducing the environmental impact and cost of digital consumption.[9]

#### *The Related Party Transactions Misconduct*

---

[6]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001758009/000121390025025561/ea0234742-10k_quantum.htm#a_002

[7] *Id.*

[8] *Id.*

[9] https://www.electrooptics.com/article/photonics-start-raises-7m-commercialise-pic-foundry-service

78.    As revealed in the Capybara Report, during the Relevant Period, the Individual Defendants engaged in the Related Party Transactions Misconduct, whereby they engaged in and/or caused the Company to engage in a scheme to participate in transactions with related parties that benefitted the Individual Defendants and damaged the Company.

79.    Defendant Liscouski was serving as a director as Quad M at the time the Company announced that Quad M was its first consulting customer; however, the Individual Defendants failed to disclose this relationship to investors. Notably, Capybara reported that Quad M was "***an OTC listed company with ties to multiple stock frauds.***" In addition, one of the Company's founders was involved in millionways, but that, too, was not disclosed to investors. Indeed, with respect to the undisclosed millionways and Quad M related party transactions, the Capybara Report revealed the following, in relevant part:

> *After interviewing former employees and others associated with the company, they said it was common knowledge among employees that the [QUANTUM] CEO was doing anything he could, to issue PRs to drive the share price higher. "They insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't." - Former Employee*

> - For years [QUANTUM] has issued false press releases. Early on, the company even signed fake deals with undisclosed related parties. The sole purpose for these deals was to issue false press releases and pump their stock.

> **- [QUANTUM] is currently being sued for fraud and the plaintiffs allege that the company announced sales deals that were completely false. The plaintiff alleges that the sales were completely fabricated and were never even invoiced.**

> - In May 2023, [QUANTUM] announced the signing of a LOI to acquire Millionways Inc, a purported AI company.

> **- Undisclosed to investors, Millionways was a related party. One of [QUANTUM]'s founders was involved in Millionways.**

- [QUANTUM] paid Millionways $500k via an unsecured note, which [QUANTUM] has been quietly marking down because they will never be paid back.

*- In 2022, [QUANTUM] announced a deal with Quad M, an OTC listed company with ties to multiple stock frauds.*

*- Undisclosed to investors, Quad M was a related party. [QUANTUM]'s CEO served as a director of Quad M and the co-founders of [QUANTUM] were also deeply involved in Quad M and are close business associates of Quad M insiders.*

- In 2022 [QUANTUM] signed an MOU with Quad M claiming that they would generate 5-10 dollars per employee per month for [QUANTUM]. *Unsurprisingly, the deal never materialized and generated no revenue.*

80.    Notably, the Board, who at the time consisted of, *inter alia*, Defendants Fagenson, Huang, and Turmelle, unanimously approved the Letter of Intent to enter into the related party transaction with millionways. Defendants Fagenson, Huang, and Turmelle knew or should have known that this transaction would be harmful to the Company and that Company insiders were heavily involved in millionways's business but failed to disclose the same to investors, instead representing that the entity had partnered with Quantum due to its impressive quantum computing capabilities, among other things.

## FALSE AND MISLEADING STATEMENTS

### March 30, 2020 Form 10-K

81.    The Relevant Period began on March 30, 2020, the first trading day after the Company filed its annual report on Form 10-K (the "2019 10-K") with the SEC for the fourth quarter ("4Q19") and year ended December 31, 2019 (the "2019 Fiscal Year"). The 2019 10-K was signed by Defendants Liscouski, Roberts, and Velge and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Liscouski and Roberts certifying that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements

were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

82.     Regarding the Company's purported quantum computing technology, services, and products, the 2019 10-K stated the following, in relevant part:

> Quantum Asset Allocator: We have released our first commercial product for the FinTech, or Financial Technology, market, the Quantum Asset Allocator (QAA) . . . . QAA is available both as a cloud-based software service and as an on-premises software-plus-hardware system. Both implementations are designed to quickly return optimal or nearoptimal interactive solutions and analyses of financial asset allocation problems.
>
> * * *
>
> "Mukai" quantum application development platform: The Company recently released its "Mukai" quantum application development platform. Mukai can be used to solve extremely complex optimization problems, which are at the heart of some of the most difficult computing challenges in industry and government. Its software stack enables developers to create and execute quantum-ready applications on classic computers, while being ready to run on quantum computers when those systems can achieve performance advantages . . . . The Company has already demonstrated superior performance against established computational benchmarks for some applications built on Mukai and running on classical computers.

### March 18, 2021 Form 10-K

83.     On March 18, 2021, the Company filed its annual report on Form 10-K (the "2020 10-K") with the SEC for the fourth quarter ("4Q20") and year ended December 31, 2020 (the "2020 Fiscal Year"). The 2020 10-K was signed by Defendants Liscouski, Roberts, Velge, and Fagenson and contained substantively the same SOX certifications as set forth in ¶81 above signed by Defendants Liscouski and Roberts.

84.     With respect to Qatalyst, the 2020 10-K stated the following, in relevant part:

> Qatalyst (formerly Mukai) is our answer to the current state of the quantum computing industry. As the industry's first publicly available Quantum Application

Accelerator, Qatalyst enables developers to create and execute quantum-ready applications on conventional computers, while being ready to run on quantum computers where those systems achieve performance advantage. Qatalyst performs the complex problem transformations necessary to be executed on a variety of quantum platforms today, and users can call upon the same Qatalyst APIs (Application Programming Interfaces) to achieve optimization performance advantages on conventional computers using our cloudbased solution.

***January 19, 2022 Press Release***

85.    On January 19, 2022, the Company issued a press release announcing that it had entered into an agreement with Quad M to "provide consulting and quantum-driven solutions[.]" The press release highlighted Quad M's purportedly advanced quantum computing technology, while at the same time failing to disclose that Quad M was a related party, stating the following, in relevant part:

> QCI will deliver health insurance underwriting applications to Quad M for optimization of its underwriting services as a subscription with a monthly fee for every employee that avails themselves of Quad M's health solution. Quad M expects to apply these applications to over 100,000 insured lives by the end of 2022.
>
> * * *
>
> This collaboration will utilize QCI's Qatalyst™ software to provide more accurate and diverse underwriting insights, leveraging quantum ready classical, early NISQ [noisy intermediate-scale quantum], and eventually full-scale quantum computers. QCI will work with Quad M's database of 100K employees to provide deeper insights that drive more robust underwriting solutions for Quad M. Once proven, Quad M and QCI will jointly market the product to other self-insured companies as well as medical insurance providers.

***February 24, 2022 Press Release***

86.    On February 24, 2022, the Company published a press release disclosing that it had entered into an exclusive marketing agreement with QPhoton. In relevant part, the press release stated:

> By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing for specific applications and markets. QPhoton technologies will also offer QCI reseller, technology and QPU [quantum processing unit]

partners enhanced solutions to further accelerate the adoption of quantum computing.

A key advantage of the Qatalyst software is that it is hardwareagnostic, supporting a variety of quantum technologies and QPUs, each with their own unique performance and computational attributes. This eliminates the need for deep, complex low-level coding and vendor lock-in required by available software alternatives.

### *March 15, 2022 Form 10-K*

87.    On March 15, 2022, the Company filed its annual report on Form 10-K (the "2021 10-K") with the SEC for the fourth quarter ("4Q21") and year ended December 31, 2021 (the "2021 Fiscal Year"). The 2021 10-K was signed by Defendants Liscouski, Roberts, Turmelle, Velge, and Fagenson and contained substantively the same SOX certifications as set forth in ¶81 above signed by Defendants Liscouski and Roberts.

88.    With respect to Qatalyst, the 2021 10-K contained the same statements as the 2020 10-K as set forth in ¶84 above.

89.    In the 2021 10-K, the Company stated the following regarding its related party transactions, notably failing to disclose any business dealings with Quad M:

The following is a summary of transactions since January 1, 2019 to which we have been or will be a party in which the amount involved exceeded or will exceed $162,761 (one percent of the average of our total assets at year-end for our last two completed fiscal years) and in which any of our directors, executive officers or beneficial holders of more than 5% of any class of our capital stock, or any immediate family member of, or person sharing a household with, any of these individuals, had or will have a direct or indirect material interest, other than compensation arrangements that are described under the section captioned "Executive compensation."

Other than as disclosed below, there have been no transactions involving the Company since the beginning of the last fiscal year, or any currently proposed transactions, in which the Company was or is to be a participant and the amount involved exceeds $120,000 or one percent of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest.

*May 24, 2022 Press Release*

90.     On May 24, 2022, the Company published a press release "announc[ing] that it has entered into a definitive agreement to acquire QPhoton" (the "May 2022 Press Release"). The May 2022 Press Release represented that "[t]he acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing, and other powerful technologies, into easily deployable solutions today, and advances QCI into a full-spectrum quantum software and hardware company." In addition, the May 2022 Press Release quoted Defendant Liscouski, who stated that "[t]he combination of QPhoton's powerful quantum processing technology and systems with QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real business problems."

*June 16, 2022 Press Release*

91.     On June 16, 2022, the Company published a press release announcing that it had closed its acquisition of QPhoton. In relevant part, the press release quoted Defendant Liscouski, who stated that "[t]his acquisition represents a significant leap forward in real-world usability in the quantum computing space" and would purportedly result in the Company becoming "a provider of full-stack quantum software and hardware solutions[.]"

92.     The statements in ¶¶81-91 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party

transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2022 Proxy Statement*

93.    On August 12, 2022, the Company filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle solicited the 2022 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

94.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle to the Board; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered public accounting firm for 2022; (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers; and (4) approve the Quantum Computing Inc. 2022 Equity and Incentive Plan (the "Plan").

95.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated the following:

> The Company currently maintains a Code of Ethics which applies to all directors, officers, and employees. A copy of our Code of Ethics can be found on our website at *www.quantumcomputinginc.com*.

96.    With respect to the proposal to approve the Plan, the 2022 Proxy Statement stated the following, in relevant part:

> On July 5, 2022, the Board approved, authorized and adopted, subject to stockholder approval, the 2022 Plan and certain forms of ancillary agreements to be used in connection with the issuance of stock and/or options pursuant to the 2022 Plan (the "Plan Agreements"). **The 2022 Plan provides for the issuance of up to 16,000,000 shares of Common Stock through the grant of non-qualified options (the "Non-qualified Options"), incentive options (the "Incentive Options" and**

**together with the Non-qualified Options, the "Options") and restricted stock (the "Restricted Stock")restricted stock units, stock appreciation rights ("SARs") and other equity-based awards to directors, officers, consultants, attorneys, advisors and employees.**

The Company has one additional equity compensation plan in place, the 2019 Equity Incentive Plan, as amended (the "2019 Plan"). Our Board adopted the 2019 Plan in February 2019. Our stockholders approved the 2019 Plan in August 2019. The objective of the Plan is to encourage and enable the officers, employees, directors, consultants and other key persons of the Company and its subsidiaries, upon whose judgment, initiative and efforts the Company largely depends for the successful conduct of its business, to acquire a proprietary interest in the Company. The 2019 Plan provides for the issuance of up to 3,000,000 shares of Common Stock through the grant of non-qualified options (the "Non-qualified Options"), incentive options (the "Incentive Options" and together with the Non-qualified Options, the "Options") and restricted stock (the "Restricted Stock") to directors, officers, consultants, attorneys, advisors and employees.

The 2019 Plan is our only ongoing plan providing stock-based awards to employees and non-employee directors. In addition to stock-based compensation, the 2019 Plan also authorizes the issuance of awards payable in cash. Our ability to provide long-term incentives in the form of equity compensation aligns management's interests with the interests of our stockholders and fosters an ownership mentality that drives optimal decision-making for the long-term health and profitability of our Company. Equally important, equity compensation is critical to our continuing ability to attract, retain and motivate qualified corporate executives and retain management. Our ability to grant equity compensation has been important to our past success, and we expect it to be crucial to achieving our long-term growth.

As of July 29, 2022, there were (i) options to purchase an aggregate of 3,000,000 shares of Common Stock outstanding under the 2019 Plan at a weighted-average exercise price of $4.13 per share, and (ii) 0 shares of unvested restricted Common Stock outstanding under the 2019 Plan. Between the dates whereby the 2019 Plan has become effective, November 14, 2019 and July 29, 2022, 30,000 shares of Common Stock have become issued and outstanding as a result of vested awards under the 2019 Plan. **The Company does not have any shares available under the 2019 Plan.**

Following the Closing under the QPhoton Agreement and Plan of Merger, we expect to hire additional employees for which we will need additional equity plan shares. **The Board adopted the 2022 Plan to ensure that, as the Company grows, and with the potential issuance of shares of Common Stock in excess of 19.99% of our outstanding shares of Common Stock on June 16, 2022 (the closing date of the merger with QPhoton), we can operate effectively in our recruitment efforts, and create incentives for the retention of employees and other service providers, by granting the equity arrangements available under the 2022 Plan to**

***employees, directors, and key consultants at levels determined appropriate by the Compensation Committee.*** In addition to our five directors (which include our Chief Executive Officer and Chief Financial Officer), approximately 26 employees and approximately 10 key consultants are eligible to participate in the 2022 Plan. The Board believes that adopting the 2022 Plan is consistent with the Company's compensation philosophy (and with responsible compensation policies generally) and will preserve the Company's ability to attract and retain capable officers, employees, directors and consultants. The Board believes it is imperative, in view of our compensation structure and strategy that the 2022 Plan be approved.

97.     Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

98.     The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct.

99.     As a result of Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter*

*alia*, to: (1) reelect Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered public accounting firm for 2022; (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers; and (4) approve the Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future.

### *February 8, 2023 Press Release*

100.     On February 8, 2023, the Company published a press release announcing "a subcontract award from SSAI [Science Systems Applications, Inc.] to support NASA in testing one of its proprietary quantum photonic systems for remote sending applications." In relevant part, the press release stated:

> Under the subcontract, QCi will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks . . . based on a recent breakthrough theory . . . . The QCi LiDAR system could be used to indicate changes in weather patterns which have a significant impact on water reserves available both for agricultural facilities and in cities[.]
>
> * * *
>
> QCi has recently developed a variety of quantum information technology and systems, including those of entropy quantum computing, reservoir quantum computing, quantum imaging and sensing. Its quantum photonic LiDAR systems deliver new measurement capabilities with single-photon sensitivity, strong noise rejection, and high-ranging and spatial resolution.

### *March 30, 2023 Form 10-K*

101.     On March 30, 2023, the Company filed its annual report on Form 10-K (the "2022 10-K") with the SEC for the fourth quarter ("4Q22") and year ended December 31, 2022 (the "2022 Fiscal Year"). The 2022 10-K was signed by Defendants Liscouski, Roberts, Huang, Turmelle, Velge, and Fagenson and contained substantively the same SOX certifications as set

forth in ¶81 above signed by Defendants Liscouski and Roberts. With respect to the Company's full year revenues for 2022 compared to 2021, the 2022 10-K stated the following, in relevant part:

> Revenues for the Twelve Months ended December 31, 2022 were $135,648 as compared with $0 for the comparable prior year period, a change of $135,648, or 100% . . . . All revenue in the current reporting period is derived from professional services provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in 2023 as we emphasize our hardware capability.

102.    Moreover, the 2022 10-K stated the following, in relevant part, regarding the alleged capabilities of the Company's quantum computing technologies, services, and products:

> [F]ollowing the June 2022 merger with QPhoton . . . and its associated intellectual property and engineering team, the Company is now able to provide full-stack quantum information services.
>
> The core of our quantum information services today is our Entropy Quantum Computing (EQC) technology. We have built roomtemperature, photonic quantum information processing systems underpinned by a series of patented and patent pending technologies . . . . Our technology, supported by professional services through our "Quantum Solutions" offering, helps our clients benefit from the technology today.

103.    With respect to the Company's related party transactions, the 2022 10-K contained similar statements as the 2021 10-K as set forth in ¶89 above and, like the 2021 10-K, failed to disclose the Company's business dealings with Quad M.

### *April 27, 2023 Press Release*

104.    On April 27, 2023, the Company published a press release revealing that it had entered into a partnership with millionways. The press release notably failed to disclose that millionways was a related party involved with one of the Company's founders. Instead, the press release touted that the Company had been selected as millionways's partner based on its purportedly differentiated quantum computing technology, stating the following, in relevant part:

> [QCI] . . . a first-to-market full-stack photonic-based quantum computing and solutions company, today announced the signing of a Memorandum of

Understanding with AI firm millionways to demonstrate the power of [AI] when combined with [QCI]'s Reservoir Quantum Computing (RQC).

The goal of the partnership is to explore and determine the business value of the combination of millionways' AI algorithms and QCI's existing RQC systems using audio files to produce an emotional scoring capability. If successful, the companies will develop a joint marketing and business development plan to pursue commercial opportunities.

### *May 23, 2023 Press Release*

105.    On May 23, 2023, the Company published a press release "announc[ing] that it received a follow-on task order to its subcontract award . . . to support NASA in remote sending and climate change monitoring[,]" stating the following, in relevant part:

> In addition to testing its proprietary quantum photonic system for remote sensing applications (QLiDAR), QCi will also be processing satellite images by utilizing its photonic-based reservoir computing technology. This initial testing engagement is expected to be completed during the second quarter of 2023.
>
> * * *
>
> QCi . . . will perform both the original quantum LiDAR work as well as applying photonic computing capability to process the LiDAR data. This will be accomplished under a subcontract from [SSAI] . . . . Under the expanded subcontract, QCi will run the data from the QLiDAR system through the photonic-based reservoir computer to improve the calculation of the level of water released from snowmelt.

### *July 13, 2023 Press Release*

106.    On July 13, 2023, the Company published a press release announcing that it had allegedly been "award[ed]" a "subcontract . . . from Bay Area Environmental Research Institute (BAERI) to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition" (the "July 2023 Press Release"). The July 2023 Press Release also stated that "[t]his award represents the third distinct task order from NASA and is the second research center within NASA to subcontract with the Company."

107.    With respect to the Company's work under the third subcontract, the July 2023 Press Release stated the following, in relevant part:

> Under the nine-month subcontract, QCi will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12-volt battery that consumes no more than 30 watts of power. In addition, QCi will generate reports that will detail the operation of the system in a realistic environment, provide the range of parameters and offer predictive analyses on future enhancements with a possible long-term objective to position these instruments for field deployment to create a monitoring network.

***September 21, 2023 Press Release***

108.    On September 21, 2023, the Company published a press release announcing that it had chosen a five-acre site in the ASU Research Park to be the Company's "Quantum Photonic Chip Foundry" to make TFLN chips. Among other things, the press release also represented that "[t]he location QCi chose for its new facility is on five acres within the extensive 320-acre research park hosted by ASU" and that "QCi anticipates that its chip manufacturing will commence operations first half of 2024 . . . and mass-produc[e] quantum photonics chips with complex nanophotic circuits by late 2024/early 2025."

109.    The statements in ¶¶100-108 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and

reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2023 Proxy Statement

110.    On September 27, 2023, the Company filed a Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle, *inter alia*, solicited the 2023 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

111.    The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle to the Board; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered public accounting firm for 2023; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

112.    In the section titled "Board Leadership Structure and Board's Role in Risk Oversight," the 2023 Proxy Statement stated the following:

> Robert Liscouski, who serves as our President and Chief Executive Officer, is our Chairman of the Board. The Chairman has authority, among other things, to preside over and set the agenda for Board meetings. Accordingly, the Chairman has substantial ability to shape the work of the Board. We believe that the presence of four independent members of the Board ensures appropriate oversight by the Board of our business and affairs. However, no single leadership model is right for all companies and at all times. The Board recognizes that depending on the circumstances, other leadership models, such as the appointment of a lead independent director, might be appropriate. Accordingly, the Board may periodically review its leadership structure. In addition, the Board holds executive sessions in which only independent directors are present.
>
> The Board is generally responsible for the oversight of corporate risk in its review and deliberations relating to our activities. Our principal source of risk falls into two categories, financial and product commercialization.
>
> Our Audit Committee oversees the management of financial risks; our Board regularly reviews information regarding our cash position, liquidity and operations,

as well as the risks associated with each. The Board regularly reviews plans, results and potential risks related to our business, growth, and strategies. Our Compensation Committee oversees risk management as it relates to our compensation plans, policies and practices for all employees including executives and directors, particularly whether our compensation programs may create incentives for our employees to take excessive or inappropriate risks that could have a material adverse effect on the Company.

113.    Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

114.    Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

115.    As a result of Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered public accounting

firm for 2023; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

### February 14, 2024 Press Release

116.    On February 14, 2024, the Company published a press release announcing that it had purportedly "been awarded a fourth project from NASA[.]" Among other things, the press release stated the following, in relevant part:

> QCi, the only company worldwide that can utilize Entropy Quantum Computing (EQC) to denoise LiDAR spectral information, has been tapped by Analytical Mechanics Associates on behalf of NASA to provide a new approach to remove sunlight noise from LiDAR spectral mapping in lower earth orbit.
>
> * * *
>
> NASA's continued engagement with QCi fosters a partnership for leveraging QCi's innovation in photonics.

### April 1, 2024 Form 10-K

117.    On April 1, 2024, the Company filed its annual report on Form 10-K (the "2023 10-K") with the SEC for the fourth quarter ("4Q23") and year ended December 31, 2023 (the "2023 Fiscal Year"). The 2023 10-K was signed by Defendants McGann, Liscouski, Boehmler, Huang, Turmelle, and Fagenson and contained substantively the same SOX certifications as set forth in ¶81 above signed by Defendants McGann and Boehmler. With respect to the Company's full year revenues for 2023 compared to 2022, the 2023 10-K stated the following, in relevant part:

> Revenues for the year ended December 31, 2023 were $358,047 compared to $135,648 for the year ended December 31, 2022, an increase of $222,399, or 164%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022, in each case provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in 2024 as we continue to emphasize our hardware capability.

118.    Moreover, the 2023 10-K stated the following, in relevant part, regarding the alleged capabilities of the Company's quantum computing technologies, services, and products:

QCi's core technology is Entropy Quantum Computing ("EQC"). EQC is a patent pending methodology that utilizes the environment to drive controlled energy loss in a photonic architecture . . . . This methodology allows for very low power consumption and room temperature operation. Also, due to the nature of the measurement and feedback process, EQC drives non-linear quantum interactions for "dense, fully connected" problem solving.

* * *

In addition to our photonic computing platform, we have leveraged QCi's core technology to demonstrate powerful quantum sensing use cases in LIDAR (Light Detection and Ranging), reservoir computing (a form of neural network that can be used in machine learning applications) and quantum cyber authentication (a method for highly secure communication within a network).

119.    With respect to the Company's related party transactions, the 2022 10-K contained similar statements as the 2021 10-K as set forth in ¶89 above and, like the 2021 10-K, failed to disclose the Company's business dealings with Quad M and millionways.

### *September 11, 2024 Form 10-K/A*

120.    On September 11, 2024, the Company filed an amendment to its 2023 10-K on Form 10-K/A with the SEC (the "2023 10-K/A") to, *inter alia*, "restate its consolidated financial statements, including the notes thereto, for the years ended December 31, 2023 and 2022[.]" In addition, the 2023 10-K/A "replace[d] the Report of Independent Registered Public Accounting Firm prepared by BF Borgers CPA PC ('BF Borgers') included in the [2023 10-K] with the Report of Independent Registered Public Accounting Firm from BPM LLP ('BPM')" after the SEC had "suspend[ed] BF Borgers from appearing and practicing as an accountant before the SEC and" the Company had "subsequent[ly] ret[ained] . . . BPM to replace BF Borgers[.]" The 2023 10-K/A also contained substantively the same SOX certifications as set forth in ¶81 above signed by Defendants McGann and Boehmler.

121.    With respect to the Company's revenues for the full year 2023 compared to the full year 2022, the 2023 10-K/A stated the following, in relevant part:

Revenues for the year ended December 31, 2023, were $358 thousand compared to $136 thousand for the year ended December 31, 2022, an increase of $222 thousand, or 163%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022. In each year, services were provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in the coming years as we continue to emphasize our hardware capability.

### *October 17, 2024 Press Release*

122.    On October 17, 2024, the Company published a press release announcing that it had purportedly "been awarded a fifth project from [NASA] to develop quantum remote sensing technology that would significantly lower the cost of spaceborne LIDAR imaging and advance scientific understanding of the mechanisms of climate change." In relevant part, the press release stated the following:

This is a continuation of a long-standing strategic partnership between NASA and QCi aimed at creating a radically different approach to LiDAR technology for atmospheric remote sensing measurements. The proposed approach, which is currently being developed by QCi, would significantly lower the cost of LIDAR missions, thereby allowing NASA to undertake more frequent flights to better understand the causes of climate change. The recently awarded contract is an important milestone in further assessing viability of QCi's technology.

### *October 22, 2024 Press Release*

123.    On October 22, 2024, the Company published a press release announcing that it "has reached the final stage of commissioning its quantum photonic chip foundry in Tempe, Arizona" and that "[t]he QCi Foundry has moved into its final phase of construction and capital equipment installation, with an anticipated grand opening set for Q1 2025."

124.    The statements in ¶¶116-123 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants

overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2024 Proxy Statement***

125.    On November 1, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Liscouski, Huang, Fagenson, and Turmelle, *inter alia*, solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

126.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Huang, Fagenson, and Turmelle to the Board; (2) ratify the appointment of BPM LLP as the Company's independent registered public accounting firm for 2024; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

127.    In the section titled "Board Leadership Structure and Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> Robert Liscouski, who has served as our President and Chief Executive Officer until January 31, 2024, is our Chairman of the Board. The Chairman has authority, among other things, to preside over and set the agenda for Board meetings. Accordingly, the Chairman has substantial ability to shape the work of the Board. We believe that the presence of four independent members of the Board ensures appropriate oversight by the Board of our business and affairs. However, no single leadership model is right for all companies and at all times. The Board recognizes that depending on the circumstances, other leadership models, such as the appointment of a lead independent director, might be appropriate. Accordingly, the

Board may periodically review its leadership structure. In addition, the Board holds executive sessions in which only independent directors are present.

The Board is generally responsible for the oversight of corporate risk in its review and deliberations relating to our activities. Our principal source of risk falls into two categories, financial and product commercialization.

Our Audit Committee oversees the management of financial risks; our Board regularly reviews information regarding our cash position, liquidity and operations, as well as the risks associated with them. The Board regularly reviews plans, results and potential risks related to our business, growth, and strategies. Our Compensation Committee oversees risk management as it relates to our compensation plans, policies and practices for all employees including executives and directors, particularly whether our compensation programs may create incentives for our employees to take excessive or inappropriate risks that could have a material adverse effect on the Company.

128.     Defendants Liscouski, Huang, Fagenson, and Turmelle caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

129.     Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

130.    As a result of Defendants Liscouski, Huang, Fagenson, and Turmelle causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Huang, Fagenson, and Turmelle to the Board; (2) ratify the appointment of BPM LLP as the Company's independent registered public accounting firm for 2024; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

***November 20, 2024 Press Release***

131.    On November 20, 2024, the Company published a press release announcing that it "has received its second purchase order for its [TFLN] photonic chip foundry[,]" stating the following, in relevant part:

> The order will support the research efforts of a U.S.-based university and is part of the QCi Foundry's pilot launch program, with fulfillment expected in Q1 2025.
>
> The order will enable the university to advance chip-scale acoustic and cross-domain microsystems, utilizing the scalable industrial processes provided by the QCi Foundry. As part of this order, QCi will leverage its standard TFLN processing recipes to facilitate a custom fabrication run tailored to the needs of the university. This collaboration lays the groundwork for further expanding the use of TFLN into applications that extend into micro electromechanical systems, further establishing TFLN's potential as a versatile material system and a key enabler for the next-generation photonics market and beyond.

132.    The statements in ¶131 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party

transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge as the False and Misleading Statements Continue

#### *November 27, 2024 Iceberg Report*

133.    The truth began to emerge on November 27, 2024 when, during intraday trading hours, Iceberg Research published a report titled "Quantum Computing Inc: the Phantom Chip Foundry" (the "November 2024 Iceberg Report"). The November 2024 Iceberg Report discussed the purchase order at issue in the press release set forth ¶131, stating the following, in relevant part:

> **The University of Texas pours cold water on [QUANTUM]'s press release**
>
> [QUANTUM] announced two purchase orders for its [TFLN] chips in November 2024. One with an unnamed "research and technology institute based in Asia" and the second with a "US-based university". Originally, the company disclosed the name of the US-based university–The University of Texas at Austin. But [QUANTUM] removed all references to the university yesterday.

Quantum Computing, Inc.
Announces Second Purchase
Order for TFLN Photonic Chip
Foundry from University of
Texas at Austin




NEWS PROVIDED BY
Quantum Computing Inc. →
Nov 20, 2024, 08:30 ET

SHARE THIS ARTICLE


Source: PR Newswire

> The university was likely unhappy with the representations in the release and being involuntarily part of this PR stunt. We spoke to a university professor who confirmed two things:

• Only a small order had been placed; and

• The individual in charge of the order was surprised to see the [QUANTUM] announcement, as it was not reviewed prior to release.

134. Moreover, the November 2024 Iceberg Report stated the following, in relevant part,

regarding the Company's purported TFLN foundry:

> [QUANTUM] claims to have a foundry located at 2050 E ASU Circle Suite 107 Tempe AZ 85284 – a leased space within [ASU]'s Research Park. The facility is intended to fulfil the company's announced purchase orders for TFLN chips, with production expected to begin in 1Q25, indicating that the facility is nearly ready.
>
> **QCi Lab** 5 Marine View Plaza Suite 214 Hoboken, NJ 07030
>
> **QCi Fab** 2050 E ASU Circle Suite 107 Tempe AZ 85284
>
> **QCi Administration** 1201 Wilson Blvd Floor 27 Arlington, VA 22209

*Source: QUBT website*

\* \* \*

When reached by phone, building management very confidently said there was no foundry at this address. Then an investigator was sent to have a look around the area in search of this mysterious foundry. The investigator came back with the following observations and findings:



*Source: Photo taken by investigator*

• People walking around outside said this was an office building. There are no loading docks (that have an elevated space to facilitate loading) or very large doors. There would be no way to get very large machines inside, which you would expect for a chip foundry about to start "mass production".

• [QUANTUM] was a tenant. But all the investigator saw was some people in a conference room. From the outside, the buildings do not look suitable for a foundry, which needs high ceilings and open spaces for heavy equipment, and proper ventilation for handling fumes in an environment highly sensitive to contamination. None of these seem to exist.



*Source: Photo taken by investigator*

Other tenants at the same address include IT staffing firm Experis and cloud-based content services platform VisualVault – all of a nonindustrial nature.

An old floor plan of a neighbouring identical single-story facility (2030 E. ASU Circle) shows multiple rooms, hallways, and specific spaces like restrooms, but there is no clear indication of spaces for industrial equipment.



*Source: Showcase.com*

135.    In addition, the November 2024 Iceberg Report represented that, despite the Company's representations that it had found a five-acre site in the ASU Research Park for its TFLN foundry, "the entire . . . 2050 building is barely more than an acre, let alone Suite 107 in the building" and, "[a]t the time, production was supposed to start in the first half of 2024." It also stated that the Company's "fixed asset breakdown does not align with the level of investment one might expect to establish a foundry."

### December 9, 2024 Iceberg Report

136.    The truth continued to emerge shortly after the market opened on December 9,

2024 when Iceberg Research published a second report about the Company (the "December 2024

Iceberg Report"), which stated the following, in relevant part:

> [QUANTUM] has shared photos online of what it claims to be its foundry. But this
> setup looks more like a laboratory. This is a far cry from a foundry ready for "mass
> production" on what [QUANTUM] said would be "five acres within the extensive
> 320-acre research park hosted by ASU". Throwing together some equipment does
> not make an operational TFLN-chip foundry. [QUANTUM] has already
> experienced delays compared to its initial production schedule. Many other
> companies would already be manufacturing TFLN devices, if creating such a
> facility were this straightforward.
>
>                                    * * *
>
> From 2021 to 9M24, the company reported insignificant levels of revenue, despite
> various claims, such as being a NASA sub-contractor. The company has kept
> recording losses.

137.    On this news, the Company's stock price fell $0.46 per share, or 5.8%, from a

closing price of $7.93 on December 6, 2024 to close at $7.47 per share on December 9, 2024.

However, despite this partial emergence of the truth, the Defendants continued to mislead investors

regarding, *inter alia*, the Company's relationship with NASA and the capabilities of its quantum

computing technology, thereby causing the Company's stock to remain artificially inflated.

### December 17, 2024 Press Release

138.    On December 17, 2024, the Company published a press release disclosing that it

"has been awarded a prime contract by [NASA] Goddard Space Flight Center." In relevant part,

the press release stated the following:

> This contract marks a pivotal step forward for QCi by applying its entropy quantum
> optimization machine, Dirac-3, to support NASA's advanced imaging and data
> processing demands.
>
> The contract will apply Dirac-3 to address the challenging phase unwrapping
> problem for optimally reconstructing images and extracting information from
> interferometric data generated by radar.

QCi will support NASA in its mission to unwrap interferograms at full scale, ultimately enhancing their data quality and accuracy.

139.    The statements in ¶138 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

140.    The truth fully emerged during intraday trading hours on January 16, 2025 when Capybara published the Capybara Report, announcing, *inter alia*, that the Company "is a rampant fraud"; that, "[f]rom inception, the company has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases"; and that "[t]o conceal their fraud, [the Company] even included a clause in employee separation agreements prohibiting them from talking to the SEC[.]" Among other things, the Capybara Report quoted a former Company employee, who stated that Quantum "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't."

141.    In addition, the Capybara Report quoted a former executive at Quantum, who stated the following, in relevant part:

> [It] would take a small army quite some time to make what they currently have work or be a viable product. There's been no evidence from the company. There's been no progress. They haven't even entered the game. No validation that they can run with any interesting results. Until they do that it's just a glorified University project.

142.    The Capybara Report also included discussions between the Company and various of its former employees and contractors, who indicated that the Company was artificially inflating its stock price by issuing false and misleading statements. In relevant part, the Capybara Report stated:

> **- [QUANTUM] claims to have a "longstanding relationship" with NASA, but NASA and government contract records confirm that is false.**
>
> **- [QUANTUM] has one contract with NASA valued at $26,000. [QUANTUM] was the sole bidder on the contract and it's for "computer programming".**
>
> **- We spoke with NASA and the Prime contractors named in [QUANTUM]'s PRs and we found that all the PRs are deliberately misleading and some are outright lies.**
>
> - [QUANTUM] falsely claims to have won at least 4 subcontracts "awarded by NASA" and 2 contracts directly with NASA. **NASA confirmed to us that they have no relationship with [QUANTUM] beyond the $26,000 contract noted above.**
>
> - Evidence suggests that [QUANTUM] bids on low-value NASA related contracts for the sole purpose of pumping their stock via misleading press releases.
>
> - In several cases, [QUANTUM] won subcontracts with Analytical Mechanics Associates (AMA)<BAERI, SSAI and each confirmed that [QUANTUM] was the sole bidder on the contract and all had very small revenues which [QUANTUM] hid from retail investors. NASA told us they played no role in issuing the subs.
>
> - AMA is a Prime contractor for NASA and [QUANTUM] won a contract as a sub, with no other bidders, to claim they do quantum related work for NASA. In reality, these contracts have nothing to do with quantum computing and NASA played no role in issuing the sub

*- [QUANTUM] has repeatedly misrepresented their low-value contracts as NASA contracts, doing so in Feb. 2024, Oct 2024, July 2023, May 2023 among others.*

*- [QUANTUM] has recently been removing some false and misleading PRs from their website in a futile attempt to hide their fraud.*

143.     With respect to the Company's related party transactions and the fake deals it entered into, the Capybara Report stated the following, in relevant part:

*After interviewing former employees and others associated with the company, they said it was common knowledge among employees that the [QUANTUM] CEO was doing anything he could, to issue PRs to drive the share price higher. "They insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't." - Former Employee*

- For years [QUANTUM] has issued false press releases. Early on, the company even signed fake deals with undisclosed related parties. The sole purpose for these deals was to issue false press releases and pump their stock.

*- [QUANTUM] is currently being sued for fraud and the plaintiffs allege that the company announced sales deals that were completely false. The plaintiff alleges that the sales were completely fabricated and were never even invoiced.*

- In May 2023, [QUANTUM] announced the signing of a LOI to acquire Millionways Inc, a purported AI company.

*- Undisclosed to investors, Millionways was a related party. One of [QUANTUM]'s founders was involved in Millionways.*

- [QUANTUM] paid Millionways $500k via an unsecured note, which [QUANTUM] has been quietly marking down because they will never be paid back.

*- In 2022, [QUANTUM] announced a deal with Quad M, an OTC listed company with ties to multiple stock frauds.*

*- Undisclosed to investors, Quad M was a related party. [QUANTUM]'s CEO served as a director of Quad M and the co-founders of [QUANTUM] were also deeply involved in Quad M and are close business associates of Quad M insiders.*

- In 2022 [QUANTUM] signed an MOU with Quad M claiming that they would generate 5-10 dollars per employee per month for [QUANTUM]. *Unsurprisingly, the deal never materialized and generated no revenue.*

144.    The Capybara Report also revealed, among other things, that the Company had misrepresented the progress made on the development of a TFLN foundry, as well as the purported foundry's scale. Moreover, the Capypara Report accused the Company of never having purchased the five-acre parcel at the ASU Research Park for its TFLN foundy. In relevant part, the report stated:

> • In Sep. 2023 [QUANTUM] claimed to have chosen a site for their new fab, a 5-acre plot in the ASU Research Park. Park management confirmed that [QUANTUM] inquired about the 5-acre parcel but never followed up and never attempted to purchase the property. Property records confirm that the parcel ownership has not changed.
>
> • In Oct. 2024, [QUANTUM] claimed to have opened the foundry they announced in September the prior year. However, **_the company didn't open a fully operational foundry_**, instead they opened a small R&D [research and development] lab in a leased space.
>
> • **_[QUANTUM]'s R&D lab is in an office building not suitable for industrial use cases._**
>
> • **_[QUANTUM]'s R&D space does not have a cleanroom, which is required to produce commercial quality TFLN chips._**

145.    On this news, the Company's stock price fell $1.72 per share, or 14.89%, from a closing price of $11.55 per share on January 15, 2025 to close at $9.83 per share on January 17, 2025.

## **DAMAGES TO QUANTUM**

146.    As a direct and proximate result of the Individual Defendants' conduct, Quantum will lose and expend many millions of dollars.

147.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

149.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

150.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments (including payments pursuant to the Plan) provided to the Individual Defendants who breached their fiduciary duties to the Company.

151.    As a direct and proximate result of the Individual Defendants' conduct, Quantum has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

152.    Plaintiff brings this action derivatively and for the benefit of Quantum to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Quantum, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

153.    Quantum is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

154.    Plaintiff is, and has been at all relevant times, a shareholder of Quantum. Plaintiff will adequately and fairly represent the interests of Quantum in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

156.    A pre-suit demand on the Board of Quantum is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following five individuals: Defendants Huang, Fagenson, and Turmelle (the "Director-Defendants"), and non-parties Carl Weimer and Javad Shabani. Plaintiff needs only to allege demand futility as to three of the five Directors that were on the Board at the time of the filing of this complaint.

157.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

158.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Quantum to issue false and misleading statements which were intended to make Quantum appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to

fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

159.    Pursuant to the 2022 Proxy Statement, Defendants Huang, Fagenson, and Turmelle solicited shareholders to approve the amendments to the Plan to increase the number of shares they could receive for their own benefit. These financial incentives precluded these Director-Defendants from acting in the best interests of the shareholders, as they could not simultaneously request approval of the amended Plan while also failing to provide shareholders with information in the 2022 Proxy Statement regarding the true state of the Company, including Quantum's various undisclosed related party transactions. Their solicitation, which they materially benefitted from, and the approval of the proposals were based on materially false and misleading statements and omissions. Moreover, the remaining Directors are unlikely to take action against Defendants Huang, Fagenson, and Turmelle for their solicitation of the false and misleading 2022 Proxy Statement, since this solicitation allows all of the Directors to materially benefit from the Plan in the future through the issuance of new shares. The Directors are thus conflicted from considering a demand against them based on these circumstances as well.

160.    Moreover, Defendants Fagenson, Huang, and Turmelle unanimously approved the Letter of Intent to enter into the related party transaction with millionways. Defendants Fagenson, Huang, and Turmelle knew or should have known that this transaction would be harmful to the Company and that Company insiders were heavily involved in millionways's business but failed to disclose the same to investors, instead representing that Quantum had partnered with the entity due to its impressive quantum computing capabilities, among other things. For these reasons, too, demand on Defendants Fagenson, Huang, and Turmelle is further excused as futile.

161.    Additional reasons that demand on Defendant Huang is futile follow. Defendant Huang has served as the Company's Chief Quantum Officer and as a Company director since June 14, 2022. Defendant Huang has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2022 10-K, 2023 10-K, and 2023 10-K/A and solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Plan, thereby allowing the Director-Defendants to materially benefit thereunder in the future. For these reasons, Defendant Huang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Turmelle is futile follow. Defendant Turmelle has served as a Company director since January 2022. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Turmelle has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2021 10-K, 2022 10-K, 2023 10-K, and 2023 10-K/A and solicited the false and misleading 2022, 2023, and 2024 Proxy

Statements, which resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Plan, thereby allowing the Director-Defendants to materially benefit thereunder in the future. For these reasons, Defendant Turmelle breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Fagenson is futile follow. Defendant Fagenson has served as a Company director since March 2021. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee, Nominating & Corporate Governance Committee, and Risk Committee. Defendant Fagenson has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2021 10-K, 2022 10-K, 2023 10-K, and 2023 10-K/A and solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Plan, thereby allowing the Director-Defendants to materially benefit thereunder in the future. For these reasons, Defendant Fagenson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    Defendants Fagenson and Turmelle (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

166.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

167.    Quantum has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Quantum any part of the damages Quantum suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

168.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

169.    The acts complained of herein constitute violations of fiduciary duties owed by Quantum's officers and directors, and these acts are incapable of ratification.

170.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Quantum. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Quantum, there would be

no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

171.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Quantum to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

172.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

173.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

175.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

176.     Under the direction and watch of Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle, the 2022 Proxy Statement failed to disclose that, though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed.

177.     Under the direction and watch of Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle, the 2023 Proxy Statement failed to disclose that, contrary to its descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

178.     Under the direction and watch of Defendants Liscouski, Huang, Fagenson, and Turmelle, the 2024 Proxy Statement failed to disclose that, contrary to its descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

179.     The 2022, 2023, and 2024 Proxy Statements also failed to disclose that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's

progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

180.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022, 2023, and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2022, 2023, and 2024 Proxy Statements, including, but not limited to, the re-election of directors and approval of the Plan.

181.    As a result of Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered public accounting firm for 2022; (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers; and (4) approve the Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future.

182.    As a result of Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Liscouski, Huang, Velge, Fagenson, and Turmelle to the Board,

thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered public accounting firm for 2023; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

183.    As a result of Defendants Liscouski, Huang, Fagenson, and Turmelle causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Huang, Fagenson, and Turmelle to the Board; (2) ratify the appointment of BPM LLP as the Company's independent registered public accounting firm for 2024; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

184.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022, 2023, and 2024 Proxy Statements.

185.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Quantum's business and affairs.

188.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

189.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Quantum.

190.    In breach of their fiduciary duties owed to Quantum, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendants overstated the capabilities and advancements of the Company's quantum computing technologies, products, and/or services; (2) Defendants overstated the Company's relationship with NASA and the related contracts thereunder; (3) Defendants overstated the Company's progress with respect to its TFLN foundry, as well as the demand for its TFLN chips; (4) Defendants were engaged in the Related Party Transactions Misconduct; (5) due to the foregoing, the Company's revenues relied, at least in part, on undisclosed related party transactions; and (6) the foregoing was likely to negatively impact the Company's business and reputation. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

191.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact while also participating in and/or causing the Company to participate in the Related Party Transactions Misconduct, which renders them personally liable to the Company for breaching their fiduciary duties.

192.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

193.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Quantum's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

194.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

195.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Quantum has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

196.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Quantum.

199.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Quantum that was tied to the

performance or artificially inflated valuation of Quantum or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

200.    Plaintiff, as a shareholder and a representative of Quantum, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

201.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Quantum, for which they are legally responsible.

204.    As a direct and proximate result of the Individual Defendants' abuse of control, Quantum has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Quantum has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Quantum in a manner consistent with the operations of a publicly held corporation.

208.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Quantum has sustained and will continue to sustain significant damages.

209.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

210.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

213.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Quantum to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

214.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

215.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendants McGann, Liscouski, Boehmler, and Roberts for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

216.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    Quantum and Defendants McGann, Liscouski, Boehmler, and Roberts are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants McGann's, Liscouski's, Boehmler's, and Roberts's willful and/or reckless violations of their obligations as officers and/or directors of Quantum.

218.    Defendants McGann, Liscouski, Boehmler, and Roberts, because of their positions of control and authority as officers and/or directors of Quantum, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Quantum, including the wrongful acts complained of herein and in the Securities Class Action.

219.    Accordingly, Defendants McGann, Liscouski, Boehmler, and Roberts are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

220.    As such, Quantum is entitled to receive all appropriate contribution or indemnification from Defendants McGann, Liscouski, Boehmler, and Roberts.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Quantum, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Quantum;

(c)    Determining and awarding to Quantum the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Quantum and the Individual Defendants to take all necessary actions to reform and improve Quantum's corporate governance and internal procedures to comply with applicable laws and to protect Quantum and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Quantum to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Quantum restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 31, 2025

THE BROWN LAW FIRM, P.C.

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Chrystia Siolkowsky, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28\_\_ day of March, 2025.

DocuSigned by:

*Chrystia Siolkowsky*

CB7CA3EFE7D452...

Chrystia Siolkowsky